## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM T. YEAGER,      :
                        :
          Plaintiff      :    No. 3:15-CV-2155
                        :
      vs.              :    (Judge Nealon)
                        :
NANCY A. BERRYHILL,[1] Acting  :
Commissioner of Social Security,  :
                        :
        Defendant     :

## MEMORANDUM

On November 10, 2015, Plaintiff, William T. Yeager, filed this instant appeal[2] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying his application for denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 1461, et seq. and his application for supplemental

---

1. Nancy A. Berryhill became the new Acting Commissioner of Social Security on January 23, 2017, and thus replaces Carolyn W. Colvin as the Defendant. See http://blog.ssa.gov/meet-our-new-acting-commissioner/. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

security income ("SSI")[3] under Title XVI of the Social Security Act, 42 U.S.C.

§ 1381, et seq. (Doc. 1). The parties have fully briefed the appeal. For the

reasons set forth below, the decision of the Commissioner denying Plaintiff's

application for DIB and SSI will be vacated.

## BACKGROUND

Plaintiff protectively filed[4] his applications for DIB and SSI on November

26, 2008, alleging disability beginning on February 1, 2008, due to a combination

of "degenerative disc disease, canal stenosis, nerve damage from [his] neck to

lower spine." (Tr. 271).[5] These claims were initially denied by the Bureau of

Disability Determination ("BDD")[6] on March 5, 2009. (Tr. 161, 166). On March

26, 2009, Plaintiff filed a request for an oral hearing. (Tr. 177-178). On May 4,

2010, a first oral hearing before administrative law Jennifer Whang. (Tr. 46-72).

---

3. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

4. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

5. References to "(Tr. __)" are to pages of the administrative record filed by Defendant as part of the Answer on January 14, 2016. (Doc. 9).

6. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

On June 24, 2010, the administrative law judge, Jennifer Whang, issued an unfavorable decision, finding Plaintiff not disabled. (Tr. 75-90, 948). The matter was remanded by the Appeals Council, and a second hearing was held on April 17, 2012, before administrative law judge Michelle Wolfe, ("ALJ"). (Tr. 16). On June 4, 2012, the ALJ issued a decision again denying Plaintiff's applications for SSI and DIB. (Tr. 13-30). On July 26, 2012, Plaintiff filed a request for review with the Appeals Council. (Tr. 1-5). On September 24, 2013, the Appeals Council denied Plaintiff's appeal, thus making the decision of the ALJ final. (Tr. 1051-1054).

On November 26, 2013, Plaintiff filed an initial appeal with the United States District Court for the Middle District of Pennsylvania. (Tr. 1055-1063). On September 30, 2014, this Court granted Defendant's consent motion to remand, and the case was remanded to the Commissioner for further proceedings. (Tr. 1064-1066). On November 3, 2014, the Appeals Council remanded the case back to the ALJ for consideration, with specific instruction to give further consideration to Plaintiff's Residual Functional Capacity ("RFC") during the entire period at issue, to provide specific reference to evidence in support of the assessed limitations, and to evaluate the treating and non-treating source opinions. (Tr. 1067-1071).

On April 7, 2015, a remand hearing was conducted before the ALJ, at which Plaintiff and impartial vocational expert, Patch Chillary, ("VE"), testified. (Tr. 997-1031). On July 31, 2015, the ALJ issued a decision denying Plaintiff's claims. (Tr. 944-976). This decision became final when the Appeals Council failed to act within sixty (60) days. (Tr. 359-374).

Plaintiff filed the instant complaint on November 10, 2015. (Doc. 1). On January 14, 2016, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 8 and 9). Plaintiff filed a brief in support of his complaint on March 31, 2016. (Doc. 12). Defendant filed a brief in opposition on July 6, 2016. (Doc. 17). Plaintiff filed a reply brief on August 17, 2016. (Tr. 20).

Plaintiff was born in the United States on July 20, 1967, and at all times relevant to this matter was considered a "younger individual."[7] (Tr. 266). Plaintiff graduated from high school in 1985, and can communicate in English. (Tr. 270, 276). His employment records indicate that he previously worked as a highway maintenance worker. (Tr. 272).

_____

7. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

In a document entitled "Function Report - Adult" filed with the SSA on January 9, 2012, Plaintiff indicated that he lived in a house with his family. (Tr. 278). From the time he woke up to the time he went to bed, Plaintiff dressed with help from his wife, took his son to the bus stop, then traveled to a job he took as a bus monitor where he would sit and monitor the students for one (1) hour in the morning and one (1) hour in the afternoon. (Tr. 278). He had some problems with personal care tasks such as dressing and bathing, did not prepare meals, and did the dishes and laundry from "time to time with a break in between." (Tr. 279-281). He was able to drive a car for short distances due to the "pain that [he] experienced" from traveling far. (Tr. 281). He could walk "a few yards" before needing to rest for a period of time dependent on his level of pain. (Tr. 284). When asked to check items which his "illnesses, injuries, or conditions affect," Plaintiff did not check talking, hearing, seeing, memory, concentration, understanding, following instructions, using hands or getting along with others. (Tr. 284).

Regarding concentration and memory, Plaintiff did not need special reminders to take care of his personal needs, to go places, or to take his medicine. (Tr. 280, 282). He could pay bills, use a checkbook, and count change, but could not handle a savings account. (Tr. 281). He could pay attention for "quite a

while," followed written and spoken instructions well, was not able to finish what he started, and did not hand stress or changes in routine well. (Tr. 284-285).

Socially, Plaintiff tried to go outside every day for some exercise. (Tr. 281). His hobbies included picking wild mushrooms and fiddleheads and birdwatching, but he noted he did not do these activities very often because of his spinal injury. (Tr. 283). He needed someone to accompany him if he had to travel long distances because "of [his] condition." (Tr. 283).

At his remand oral hearing on April 7, 2015, Plaintiff testified that the problems that prevented him from working were right-eye blindness, compartment syndrome in his right arm, a left knee injury, and back pain that remained unchanged from his prior oral hearing. (Tr. 1003, 1007). He stated that he lived at home with his wife and fifteen (15) year old son. (Tr. 1002). He indicated that his pain became worse when he over-exerted himself. (Tr. 1013). He indicated that side effects from his medications included drowsiness. (Tr. 1004). He stated he tried to do chores around the house, but that "after so many minutes of just standing, I'm done. I have to sit down. . . . I don't do any sweeping, mopping, dusting. I basically don't do anything around the house at all." (Tr. 1005). His activities included walking up and down the driveway and watching television. (Tr. 1005-1006). He was able to drive, "but only locally. Only a few miles." (Tr.

1011). He stated he was only able to walk fifteen (15) yards before needing to sit down for a while. (Tr. 1014). He testified that his sleep was interrupted from having to change positions and due to pain, and that he usually slept four (4) to five (5) hours a night. (Tr. 1014). He would then nap for about two (2) hours in the afternoon. (Tr. 1014).

## MEDICAL RECORDS

The medical records from February 1, 2008, the amended alleged onset date, through the date of the remand decision on July 31, 2015 will be reviewed as Plaintiff had applied not only for DIB, but also for SSI, which does not have a time limit because SSI is not dependent on any Date Last Insured.

On February 21, 2008, Plaintiff had an appointment with John Beck, M.D. and Thomas Harrington, M.D. due to complaints of back pain with numbness. (Tr. 349). Plaintiff described his pain as a muscle spasms with radiation down to his bilateral knees and numbness and tingling in his bilateral anterior thighs. (Tr. 349). He reported that pain medication helped with his pain, but that it worsened with activity. (Tr. 349). It was further noted that Plaintiff ambulated with a cane; had MRI evidence of multiple level degenerative joint disease with multiple disc protrusions; and "an ANA that was 1:80." (Tr. 349). The medications he was prescribed at the time of this appointment included Neurontin, Soma, Robaxin,

Lidocaine, Vicodin, Glucosamine Chondroitin, Etodolac, Omeprazole, and Cyclobenzaprine. (Tr. 349). His physical examination revealed the following: "TTP in medial joint line [in his bilateral knees];" "right leg with 5 degree FC and left with 3 degree FC;" the ability to rotate his head thirty (30) degrees to the left and forty-five (45) degrees tot he right; an inability to touch his chin to his chest; and a positive straight leg test on the right. (Tr. 350). Dr. Beck and Dr. Harrington agreed Plaintiff should have more lab work done. (Tr. 350).

On August 20, 2008, Plaintiff had an appointment with Dr. Harrington, a rheumatologist. (Tr. 357). Plaintiff's self-reported symptoms included constant pain aggravated by activity causing an inability to lift anything over ten (10) pounds and an inability to stand for more than five (5) minutes. (Tr. 357). He also noted that he experienced weakness and numbness in his lower extremities. (Tr. 357). It was noted that a 2005 MRI showed multiple disc protrusions at C3-4, C4-5, C5-6, and C6-7 and bulging discs in his lumbosacral spine with a small disc protrusion at L4-5. (Tr. 357). His physical examination revealed the following: pain when lifting his leg to ten (10) degrees; 1/4 deep tendon reflexes in his upper and lower extremities; sensation to light touch; limitation of extension and flexion of his cervical and lumbar spine; and no evidence of synovitis. (Tr. 357). Dr. Harrington's impression was that Plaintiff had chronic pain syndromes based on

DJD.  (Tr. 357).  Dr. Harrington "set him up for an EMG/ nerve conduction study of his lower extremities."  (Tr. 358).  Dr. Harrington opined that "I cannot believe that he will be able to carry out his job as an equipment operator and his prognosis for doing other worthwhile occupations is limited with the amount of discomfort he is having."  (Tr. 358).

On February 23, 2009, Plaintiff underwent a consultative examination by Matthew M. Kraynak, D.O.  (Tr. 458).  His physical examination revealed the following: a left shoulder limited to abduction and external rotation; diffuse spinal tenderness throughout the entire spine; occipital tenderness bilaterally; limited range of motion in the cervical and lumbar spines; and grossly intact and moderately active cranial nerves.  (Tr. 459-460).  Dr. Kraynak diagnosed Plaintiff with impingement syndrome of the left shoulder and lumbar and cervical radiculitis.  (Tr. 461).  In a Medial Source Statement of Plaintiff's ability to perform work-related activities, Dr. Kraynak opined Plaintiff could; occasionally lift and/ or carry up to twenty (20) pounds; frequently lift and/ or carry up to ten (10) pounds; stand and/ or walk for up to two (2) hours a day; sit for up to four (4) hours a day; engage in unlimited pushing and pulling within the aforementioned weight restrictions; occasionally bend, kneel, stoop, crouch, balance, and climb; and not engage in reaching with his left shoulder.  (Tr. 462).  He also opined that

Plaintiff should avoid moving machinery. (Tr. 463).

On July 10, 2009, Plaintiff had an appointment with Kalyan S. Krishnan, M.D. for complaints of neck pain and bilateral low back and hip pain that radiated down to his knees bilaterally and was associated with numbness and weakness in the anterior thighs. (Tr. 539). Plaintiff rated his pain at a six (6) to eight (8) out of ten (10), described it as constant and increased by prolonged standing, sitting, and walking, and decreased by pain medications with about fifty percent (50%) pain relief. (Tr. 539). A physical examination revealed the following: a non-tender neck with no masses, lymphadenopathy or bruits and an intact range of motion; no CVA tenderness in his back; no edema, cyanosis, ulcerations or positive sciatic tension sign in his extremities; grossly intact cranial nerves; intact gait; slow and cautious sensation to light touch decreased over anterior thighs bilaterally but otherwise intact in the lower extremities bilaterally; 4/5 strength in his upper extremities bilaterally secondary to increased neck pain bilaterally; 4/5 strength in the lower extremities bilaterally secondary to increased low back pain with all testing; bilateral paracervical tenderness and trapezsial spasm; bilateral paraspinal tenderness to palpation in his lumbar region; bilateral parasacral tenderness; and increased pain in the lumbar region on flexion and extension. (Tr. 542). Dr. Krishnan assessed Plaintiff as having degenerative disc disease of the lumbar

spine; lumbar spondylosis; lumbago; bilateral lower extremity radiculopathy/ parathesia; and cervicalgia. (Tr. 542).

On July 24, 2009, Plaintiff underwent a caudal epidural steroid injection performed by Dr. Krishnan for spinal stenosis, neuropathic pain, and lumbar and degenerative disc disease. (Tr. 553). Prior to the injection, Plaintiff reported that his pain was located in the lower back and his bilateral legs with pain in the "L3/4 and L5 root distribution," was rated at a six (6) out of ten (10), was constant, and increased with lifting, sitting, or walking. (Tr. 554). He also complained of neck pain at the base of his skull with occipital radiation. (Tr. 554). His physical examination prior to the injection revealed: intact, but slow and cautious, gait and cranial nerves; decreased sensation to light touch over his anterior thighs bilaterally; increased neck pain with some pain at the base at the skull with 5/5 upper strength bilaterally; "slr on the left with back pain and some left leg numbness;" 5/5 strength bilaterally in his lower extremities; bilateral paracervical tenderness in his cervical and lumbar spine and sacroiliac joints; and increased pain on flexion and extension prior to endpoint. (Tr. 554-555). The assessment noted Plaintiff had degenerative disc disease of his lumbar spine "with worst level L4/5 without foraminal;" lumbar spondylosis; lumbago; bilateral lower extremity radiculopathy and paresthesias; and cervicalgia. (Tr. 555). Plaintiff was

instructed to continue remaining active as tolerated; to continue with his prescriptions; and that he may "need c spine done at some point." (Tr. 555).

On September 18, 2009, Plaintiff underwent a right shoulder injection. (Tr. 566). The procedure was performed by Dr. Christian for joint pain in his shoulder. (Tr. 566, 568). Plaintiff also underwent imaging of his right shoulder, which revealed the following: "osseous structures and articulations of the right shoulder girdle appear age appropriate and satisfactorily aligned and/ or maintained. No rotator cuff calcifications are seen." (Tr. 569). Dr. Christian interpreted this x-ray as "satisfactory." (Tr. 571).

On April 14, 2010, Dr. Christian completed a "Medical Source Statement Regarding the Nature and Severity of Medical Impairments with Respect to Work-Related Physical Activities." (Tr. 578). He opined Plaintiff: could occasionally lift and/ or carry up to twenty (20) pounds; could frequently lift and/ or carry up to ten (10) pounds; could stand and/ or walk for up to four (4) hours in an eight (8) hour workday; could sit for four (4) hours in an eight (8) hour workday; could stand and/ or walk for five (5) minutes or less before needing to sit; could sit for up to twenty (20) minutes before needing to stand and/or walk; must move away from a work station for five (5) minutes after sitting for twenty (20) minutes; did not require a hand-held assistive device to stand and/ or walk; would require four

12

(4) unpredictable rest periods during a workday for ten (10) to fifteen (15) minutes at a time; should completely avoid crouching, stooping, twisting, squatting, and climbing; should avoid concentrated exposure to hazards, heights, fumes, odors, dust, and poor ventilation; could use his arms out in front of his body fifty percent (50%) of the time bilaterally; could reach overhead and push/ pull with his arms ten percent (10%) of the time bilaterally; and could push/pull with his feet five percent (5%) of the time bilaterally.  (Tr. 578-579).  He also opined that Plaintiff's impairments and treatment would cause him to miss work more than two (2) days per month.  (Tr. 579).  Dr. Christian's opinion was based on medical and clinical findings reflected in Plaintiff's treatment records and observed during examination.  (Tr. 579).

On December 29, 2010, Plaintiff underwent diagnostic imaging of his lumbar spine.  (Tr. 754).  The impression was that Plaintiff had: (1) "a congenitally narrow lumbar spinal canal along with prominent dorsal epidural lipomatosis visualized;" and (2) multilevel degenerative changes involving the lumbar spine including diffuse posterior disc bulge and facet joint hypertrophic seem contributing to the already narrow lumbar spinal canal as detailed above." (Tr. 755).  Also noted was mild neural foraminal narrowing at the L2/L3, L3/L4, and L4/L5 levels.  (Tr. 754).

On July 6, 2011, Plaintiff underwent diagnostic imaging for left arm pain. (Tr. 584). The impression was that Plaintiff had a mild deformity of the posterior lateral humeral head consistent with prior/ age indeterminate dislocation and postsurgical changes to the bony glenoid, and likely a displace suture anchor projecting over the proximal humeral metaphysis. (Tr. 584). He also underwent diagnostic imaging for his neck pain, which showed a "straightening of the expected cervical lordosis," mild diffuse loss of intervertebral disc space height from C2-C3 through C6-C7, and mild anterior osteophytosis. (Tr. 585).

On July 25, 2011, Plaintiff had an appointment with Matthew McElroy, M.D. for his left shoulder injury and pain. (Tr. 586). After an examination, Dr. McElroy ordered an MRI without contrast. (Tr. 587).

On July 25, 2011, Plaintiff underwent a lumbar medial branch injection performed by Dr. Krishnan. (Tr. 595). It was noted that his pain was located in his lower back with radiation into his buttocks and down the back of his legs into his knees. (Tr. 596). He rated his pain at a five (5) to six (6) out of ten (10) and noted it was constant. (Tr. 596). His physical examination before the injection revealed: moderate palpable tenderness and paraspinal pain with range of motion that was mild with flexion and moderate with extension and rotation; 5/5 strength symmetrically and bilaterally in all major motor groups; intact gait; and negative

sciatic tension signs in a seated position. (Tr. 596). After he received the bilateral medical branch injection blocks, he was instructed to remain active as tolerated. (Tr. 596).

On August 9, 2011, Plaintiff had an appointment with Glen Feltham, M.D. for left shoulder pain. (Tr. 660). Plaintiff reported that his shoulder felt like it was popping out of place and that he was in pain. (Tr. 660). His physical examination revealed: no real tenderness around his shoulder, but a little bit anteriorly over the coracoid; flexion and abduction to one hundred eighty (180) degrees; internal rotation to the low lumbar region; a negative load shift test; no subluxations; and weakness with the supraspinatus in external rotation. (Tr. 661). Dr. Fetlham diagnosed Plaintiff with a subacromial impingement, rotator cuff dysfunction, and glenohumeral arthrosis. (Tr. 661). He recommended treatment with a subacromial injection and physical therapy. (Tr. 661).

On February 1, 2012, Plaintiff visited the emergency room ("ER") at Geisinger in Danville, Pennsylvania after he discharged a shotgun and a bolt "kicked back during a misfire and struck him in the eye." (Tr. 615). On examination, he had a retinal hemorrhage and an area of whitening with elevated pressure. (Tr. 618). Examination and a CT scan revealed a "hearvily comminuted, displaced right zygomaticomaxillary complex fracture pattern; a comminuted,

displaced right orbital fracture floor; minimally displaced fractures of the right medial orbital wall and nasal process of the right maxilla; right lid laceration with apparent involvement of the medial canthus and the lacrimal system; and a right fixed and dilated pupil. (Tr. 624, 630-631). Plaintiff was referred to an Ophthalmologist for further treatment. (Tr. 624). No ruptured globe was found on exploratory surgery. (Tr. 638).

On March 19, 2012, Plaintiff had an appointment with Tamara Vrabec, M.D. for the eye problems that occurred as a result of the shotgun incident. (Tr. 777). Dr. Vrabec diagnosed Plaintiff with lacerations of the lower lid; orbital floor and ZMC fractures; suprahoroidal hemorrhage with choroidal ruptures; vitreous hemorrhage without retinal detachment; elevated intra-occular pressure; and traumatic mydriasis. (Tr. 778-779). Plaintiff was scheduled for a fracture stabilization procedure. (Tr. 788). His visual prognosis was "guarded 6 + weeks from initial injury." (Tr. 789).

On March 24, 2012, Plaintiff underwent surgery to repair the damage to his right eye that was performed by John Frodel, M.D. (Tr. 1199). This surgery was included "right ZMC malposition/ enophthalmos repair and periorb reconstruction, midface lift." (Tr. 1199).

On March 29, 2012, Plaintiff had a follow-up visit with Dr. Frodel. (Tr.

1199).  His examination revealed "appropriate right periorbital edema, vision grossly intact with mild diplopia."  (Tr. 1199).

On April 3, 2012, Dr. Christian completed a second Medical Source Statement.  (Tr. 942-943).  He opined Plaintiff: could occasionally lift and/ or carry up to ten (10) pounds; could frequently lift and/ or carry up to five (5) pounds; could stand and/ or walk for up to two (2) hours in an eight (8) hour workday; could sit for six (6) hours in an eight (8) hour workday; could stand and/ or walk for five (5) minutes or less before needing to sit; could sit for up to twenty (20) minutes before needing to stand and/or walk; must move away from a work station for five (5) minutes after sitting for twenty (20) minutes; did not require a hand-held assistive device to stand and/ or walk; would require five (5) unpredictable rest periods during a workday for fifteen (15) to twenty (20) minutes at a time; should completely avoid crouching, stooping, twisting, squatting, and climbing; should avoid all exposure to hazards and heights; should avoid concentrated exposure to fumes, odors, dust, and poor ventilation; could use his arms out in front of his body fifty percent (50%) of the time on the right and forty percent (40%) on the left; could reach overhead and push/ pull with his arms five percent (5%) of the time bilaterally; and could push/pull with his feet five percent (5%) of the time bilaterally.  (Tr. 942-943).  He also opined that Plaintiff's

impairments and treatment would cause him to miss work more than two (2) days per month. (Tr. 943).

On April 11, 2012, Plaintiff had a follow-up visit with Dr. Frodel. (Tr. 1206-1208). It was noted that Plaintiff had a choroidal rupture with hemmorrhage "with commotio OD" that rendered an uncertain visual prognosis, a vitreous hemmorrhage "OD," and resolved secondary open angle glaucoma "OD." (Tr. 1208). It was noted that Plaintiff was having "quite a bit of difficulty emotionally adjusting to current essentially monocular status." (Tr. 1207). Plaintiff was advised that he would need corrective surgery in the future. (Tr. 1209).

On April 25, 2012, Plaintiff had a follow-up with Dr. Frodel. (Tr. 1218). It was noted that Plaintiff was doing better and had less swelling, but still had pain. (Tr. 1218). The exam revealed the following: "less but appropriate right periorbital edema, vision grossly intact with mild diplopia - - improving, significant UL ptosis." Dr. Frodel stated that further improvement was expected, and prescribed pain medication. (Tr. 1218).

On May 16, 2012, Plaintiff had an appointment with Daniel Upton, M.D. in the Ophthalmology Department at Geisinger Danville. (Tr. 1225). Plaintiff reported that his eyelashes were crusty, that he had a foul smelling discharge, and that his eyes were itchy. (Tr. 1225). His physical examination revealed that he

18

had mild entropion in his right eye due to scarring with multiple lashes irritating his conjunctiva, but without significant corneal involvement.  (Tr. 1226).  He was prescribed eye drops and ointment, and it was noted that surgical correction with oculoplastics would be discussed at a future visit.  (Tr. 1226).

On August 9, 2012, Plaintiff had a follow-up for his right eye impairment with Wells Reinheimer, DO.  (Tr. 1272).  He complained of right eye irritation, and was diagnosed with Trichiasis of his eyelid without entropion.  (Tr. 1272).

On September 14, 2012, Plaintiff had a follow-up for his right eye with Dr. Frodel.  (Tr. 1275).  It was noted that Plaintiff was doing better, but still had pain and limited diplopia.  (Tr. 1275).  Plaintiff stated that he could "see out of [his] right eye but everything [was] just blurry and sometimes [he did] still have pain." (Tr. 1307).  His eyelid trichiasis had completely resolved.  (Tr. 1275).  His physical examination revealed minimal edema, grossly intact vision with mild diplopia, "both limited enophthalmos/ hypophthalmos," and "UL ptosis."  (Tr. 1275).  Dr. Frodel's recommendation was to consider revision of the orbital reconstruction at one year post-op.  (Tr. 1275).

On November 16, 2012, Plaintiff underwent a CT scan of his face for a baseline of his orbital reconstruction.  (Tr. 1315).  The impression was that there was internal fixation of previously seen right orbit and maxillary fractures that

involved the lateral right orbital wall and floor, anterior and posterior maxillary sinus walls and zygomatic arch. (Tr. 1315). It was noted that overall alignment had improved with the right orbital floor slightly lower than the left and the right zygomatic arch fracture showing some bridging callus. (Tr. 1315). Three dimensional reconstructions were performed from the axial data, which confirmed "that there is lateral-inferior displacement of the right zygomatic bone with enlargement of the right orbit." (Tr. 1316).

On November 16, 2012, Plaintiff had a follow-up appointment with Steven Marks, M.D. for his right eye impairment. (Tr. 1329). Plaintiff reported there had been no change in his vision. (Tr. 1330).

On April 27, 2013, Plaintiff presented to the ER at Geisinger Shamokin Area Community Hospital due to a right arm injury after a door fell onto his arm four (4) days earlier. (Tr. 1482). A physical examination revealed swelling, tenderness and ecchymosis in his right arm with an intact neur-vascular system and good strength in both arms. (Tr. 1484). An x-ray was negative for fracture and dislocation. (Tr. 1484). He was diagnosed with a right arm contusion and discharged. (Tr. 1485).

On May 8, 2013, Plaintiff returned to the ER for continuing right arm pain in his mid forearm along with numbness. (Tr. 1486). An examination revealed his

right arm was swollen and firm to touch, ecchymosis around the bicep, and parasthesias of the fourth and fifth fingers and along the lateral posterior forearm. (Tr. 1488). Plaintiff was diagnosed with upper arm compartment syndrome and probable biceps rupture. (Tr. 1488). Plaintiff was admitted to Orthopedics. (Tr. 1489).

On May 8, 2013, Plaintiff underwent a right upper arm anterior compartment fasciotomy and distal biceps rupture repair. (Tr. 1345). Plaintiff was discharged on May 11, 2013. (Tr. 1499). His follow-up on May 16, 2013 noted that he continued to have some numbness to his forearm and that his pain was controlled with pain medication. (Tr. 1345). His follow-up on May 21, 2013 with Louis Grandizio, D.O. noted that Plaintiff was doing well and that he could begin gentle "home motion therapy trying to work on getting his terminal extension back." (Tr. 1354). He was instructed not to lift anything heavier than a cup of coffee. (Tr. 1354).

On May 29, 2014, Plaintiff had an initial evaluation appointment with Thomas Hood, M.D. for treatment of his pain. (Tr. 1551). He described his pain as throbbing, burning, tingling, cramping, aching, crushing, sickening, pulling, squeezing, and fearful that became sharp and shooting many times a day. (Tr. 1551). He reported that his pain increased with lifting, using the stairs, walking,

standing, and sitting. (Tr. 1551). He rated the average intensity of his pain at a seven (7) out of ten (10). (Tr. 1551). His medications at this visit included Percocet, Vicodin, Neurontin, Omeprazole, and Soma. (Tr. 1552). His physical examination revealed: moderate paraspinal muscle spasm in the cervical and lumbar spine with more localized tenderness along the facet joints; marked tenderness over the bilateral sacroiliac joints with positive stress tests for sacroiliac joint arthropathy; moderate tenderness over the gluteal bursa area; painful shoulder abductions; increased sensitivity and tenderness in the area supplied by the trigeminal nerve maxillary branch, occipital nerve, suprascapular nerve, intercostal nerves, ilioinguinal nerve, and lateral cutaneous nerve of the thigh; and trigger points in the temporalis muscle, scalenes muscle, splenius capitis muscle, iliocostalis muscle, quadratus lumborum muscle, vastus lateralis muscle, vastus medialis muscle, and brachioradial muscle. (Tr. 1553). He was assessed as having the following: lumbar degenerative disc disease; lumbar spondylosis without myelopathy; facet joint arthropathy; trigeminal neuralgia of the maxillary branch; occipital neuralgia; suprascapular neuralgia; intercostal neuralgia; ilioinguinal neuralgia; meralgia paresthetica; bursitis around the hip and shoulder; sacroiliac joint arthropathy; and myofascial pain. (Tr. 1553). Plaintiff was given prescriptions for Percocet, Norco, Soma, and Neurontin. (Tr. 1553).

On June 4, 2013, Plaintiff had a follow-up with Dr. Grandizio for his biceps impairment. (Tr. 1361). Plaintiff reported that he had pain since switching from Percocet to Vicodin, that he had not been sleeping well, and that he had dysesthesias in the lateral antebrachial cutaneous nerve distribution. (Tr. 1361). He was instructed to stop using the sling except when in crowds, to start physical therapy to get motion back, to avoid strengthening, and to not lift anything heavier than a cup of coffee. (Tr. 1361-1362).

On July 9, 2013, Plaintiff had a follow-up with Daniel Deasis, M.D. for his biceps impairment. (Tr. 1373). Plaintiff reported he had pain in the distal aspect of his right forearm in the lateral antebrachial cutaneous nerve distribution, and numbness and tingling in the same area. (Tr. 1373). His physical examination revealed painful but full pronation and supination; passive flexion of his right forearm to one hundred twenty-five (125) degrees and terminal extension to zero (0) degrees; decreased sensation to light touch in the distal aspect of the lateral antebrachial cutaneous nerve distribution; and an intact right upper extremity neurovascularly and neurologically. (Tr. 1373-1374). Dr. Deasis indicated that the numbness and pain in his arm was most likely due to some kind of nerve entrapment in the scar along his upper extremity. (Tr. 1374). Plaintiff was instructed to begin resistive exercises, but not to increase the weight more than

once a week.  (Tr. 1374).

On August 31, 2014, Plaintiff presented to the ER at Geisinger Danville due to left knee pain that began after a hiking accident.  (Tr. 1512).  His physical examination revealed: no tenderness in his back; limited knee testing secondary to pain and swelling; and a normal neuro exam.  (Tr. 1515).  An x-ray was taken of his left knee, and no dislocation or fracture was seen.  (Tr. 1515).

On September 8, 2014, Plaintiff had an x-ray of his left knee due to pain. (Tr. 1434).  The impression was that there was no fracture or dislocation, and that his soft tissues were unremarkable.  (Tr. 1435).  Plaintiff was diagnosed with a knee injury and discharged the same day.  (Tr. 1515).

On September 9, 2014, Plaintiff underwent an MRI of his left knee.  (Tr. 1449).  The impression was as follows: (1) evidence of a probably old ganglion along the medial aspect of the knee; (2) possible lateral patellar dislocation with reduction and tear of the medial pattelofemoral ligament; (3) a moderate-sized Baker cyst; and (4) mild effusion.  (Tr. 1450).

On September 16, 2014, Plaintiff had an appointment with Dr. Fanelli for his left knee pain.  (Tr. 1459).  His physical examination revealed that his left knee was positive for effusion, had generalized tenderness, had normal sensations, and range of motion on flexion from ten (10) to one hundred (100) degrees.  (Tr.

24

1459).  Dr. Fanelli reviewed Plaintiff's MRI of his left knee and concluded that

there was: a bone contusion pattern consistent with a recent lateral patella

dislocation; a torn medial patellofemoral ligament/ medial retinaculum at the

femoral attachment; a soft tissue hematoma/ joint fluid tracking through the defect

into the underlying soft tissues overlying the medial femoral condyle, accounting

for collection/ ganglion; and no central enhancement to suggest soft tissue

sarcoma.  (Tr. 1459-1460).

On September 26, 2014, Plaintiff had an appointment with Dr. Bowen for an

evaluation of the abnormalities of his left knee.  (Tr. 1468).  Plaintiff reported that

he has had constant knee pain that occurred at night when he ambulated and at all

times, that he used a cane to ambulate, and that he was able to manipulate his left

patella.  (Tr. 1468).  His physical examination revealed: left knee active range of

motion from five (5) to one hundred (100) degrees; present left foot sensation;

grossly intact left foot dorsiflexion, plantar flexion, and range of motion; pain over

the left lateral patella with manipulation of the patella; left knee swelling; and a

tenderness on palpation along the medial side of his left knee.  (Tr. 1468).

Plaintiff was told that he did not have malignancy seen on the MRI and that he

could continue care with Dr. Fanelli, and was given a prescription for physical

therapy for quadriceps strengthening.  (Tr. 1469).

On June 17, 2014, September 23, 2014, October 30, 2014, November 25, 2014 and December 22, 2014, Plaintiff had appointments with Dr. Hood for pain control. (Tr. 1533, 1536, 1539, 1542, 1548). Plaintiff reported a trending improvement in his pain over the course of these appointment, that he had been experiencing adequate pain control that allowed him to perform his routine activities, and described his pain involving multiple areas of his body as dull, throbbing, burning, tingling, cramping, aching, crushing, sickening and squeezing pain that would become sharp and shooting many times a day. (Tr. 1533, 1536, 1539, 1542, 1548). He rated his pain at a four (4) out of ten (10) at the visit. (Tr. 1533, 1536, 1539, 1542, 1548). He was assessed as having the following: lumbar degenerative disc disease; lumbar spondylosis without myelopathy; facet joint arthropathy; trigeminal neuralgia of the maxillary branch; occipital neuralgia; suprascapular neuralgia; intercostal neuralgia; ilioinguinal neuralgia; meralgia paresthetica; bursitis around the hip and shoulder; sacroiliac joint arthropathy; and myofascial pain. (Tr. 1534, 1537, 1540, 1543, 1549). Plaintiff was advised to continue his medications. (Tr. 1534, 1537, 1540, 1543, 1549).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by

substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520,

1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  Pierce v. Underwood, 487 U.S. 552, 565

(1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938));

Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);

Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has

been described as more than a mere scintilla of evidence but less than a

preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual

record, substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." Consolo v. Federal Maritime Commission,

383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in

the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07. Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. <u>See</u> 20 C.F.R. § 404.1520; <u>Poulos</u>, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an

29

impairment that is severe or a combination of impairments that is severe, (3) has

an impairment or combination of impairments that meets or equals the

requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other

work in the national economy.  Id.  As part of step four, the Commissioner must

determine the claimant's residual functional capacity.  Id.  If the claimant has the

residual functional capacity to do his or her past relevant work, the claimant is not

disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one

through four."  Residual functional capacity is the individual's maximum

remaining ability to do sustained work activities in an ordinary work setting on a

regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg.

34475 (July 2, 1996).  A regular and continuing basis contemplates full-time

employment and is defined as eight hours a day, five days per week or other

similar schedule.  The residual functional capacity assessment must include a

discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945;

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that

which an individual is still able to do despite the limitations caused by his or her

impairment(s).").

    "At step five, the burden of proof shifts to the Social Security

Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2009. (Tr. 950). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from his alleged onset date of February 1, 2008. (Tr. 950).

At step two, the ALJ determined that Plaintiff suffered from the severe[8] combination of impairments of the following: "degenerative disc disease, lumbar spondylosis, lumbosacral neuritis, osteoarthritis of the left shoulder with

---

8. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

subacromial impingement, rotator cuff dysfunction and glenohumeral arthrosis, as

of February 1, 2012 status post zygomatic repositioning and enophthalmos repair

with periorbital reconstruction after gunshot injury that included orbital floor and

ZMC fractures, globe malposition and orbital framework deficiency, ptosis OD,

right eye choroidal rupture with hemorrhage with commotion OD, trichissi OD,

right arm interior compartment syndrome, status post fasciotomy, and distal bicep

rupture status post debridement and repair in May 2013 (20 C.F.R. 404.1520( c)

and 416.920 ( c)).”  (Tr. 950).

At step three of the sequential evaluation process, the ALJ found that

Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925

and 416.926).  (Tr. 954-955).

At step four, the ALJ determined that Plaintiff had the RFC to perform light

work with limitations.  (Tr. 955-967).  Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned
> finds that, through the date last insured, [Plaintiff] has the
> [RFC] to perform a range of light work as defined in 20 CFR
> 404.1567(b) and 416.967(b) except [Plaintiff] is limited to
> occasional balancing, stooping, crouching, crawling, kneeling
> and climbing but can never climb stairs as part of the job and
> cannot climb on ladders, ropes or scaffolds.  He can

occasionally push and pull with his upper extremities, but can perform no overhead reaching with the upper extremities. He must avoid concentrated exposure to temperature extremes of cold, wetness, vibration and must avoid all hazards such a moving machinery and unprotected Heights. [Plaintiff] should have the option to transfer position from sitting to standing with the maximum of each interval 30 minutes, but he would not be off tasks when transferring. [Plaintiff] should have the ability to turn his head, left to right and up and down.

(Tr. 955-956).

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the his age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569 and 404.1569(a))." (Tr. 967-968).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between February 1, 2008, the alleged onset date, and the date of the ALJ's decision. (Tr. 968).

## DISCUSSION

On appeal, Plaintiff asserts that the ALJ erred in determining his RFC because the ALJ relied on lay reinterpretation of the medical evidence to formulate the RFC. (Doc. 12, pp. 11-15). Plaintiff also asserts that the ALJ erred in evaluating his credibility. (Id. at pp. 15-17). Defendant disputes these

contentions.  (Doc. 17, pp. 12-21).

**1.      RFC Determination**

The responsibility for deciding a claimant's RFC rests with the
administrative law judge.    See 20 C.F.R. § 404.1546.  The Court recognizes that
the residual functional capacity assessment must be based on a consideration of all
the evidence in the record, including the testimony of the claimant regarding her
activities of daily living, medical records, lay evidence and evidence of pain. See
Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121-122 (3d Cir
2000).  The Commissioner's regulations define medical opinions as "statements
from physicians and psychologists or other acceptable medical sources that reflect
judgments about the nature and severity of [a claimant's] impairment(s), including
[a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do
despite impairments(s), and [a claimant's] physical or mental restrictions."  20
C.F.R. §404.1527(a)(2).  Regardless of its source, the ALJ is required to evaluate
every medical opinion received.  20 C.F.R. §404.1527(c).

In arriving at the RFC, an administrative law judge should be mindful that
the preference for the treating physician's opinion has been recognized by the
Third Circuit Court of Appeals and by all of the federal circuits.  See, e.g.,
Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true

34

when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record.

Pursuant to Social Security Regulation 96-6p, an administrative law judge may only assign less weight to a treating source opinion based on a non-treating, non-examining medical opinion in "appropriate circumstances." SSR 96-6p, 1996 SSR LEXIS 3. This regulation does not define "appropriate circumstances," but gives an example that "appropriate circumstances" exist when a non-treating, non-

examining source had a chance to review "a <u>complete case record</u> . . . which provides more detailed and comprehensive information than what was available to the individual's treating source." <u>Id.</u> (emphasis added).

Regardless of what the weight an administrative law judge affords to medical opinions, the administrative law judge has the duty to adequately explain the evidence that he or she rejects or affords lesser weight. <u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 505-06 (3d Cir. 2009). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." <u>Burnett v. Comm'r of Soc. Sec.</u>, 220 F.3d 112, 119-20 (3d Cir. 2000).

Additionally, in choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject the treating physician's opinions outright only on the basis of contradictory medical evidence. <u>Morales</u>, 225 F.3d at 316-18. An ALJ may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. <u>Id.</u> An ALJ may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." <u>Id.</u> As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation

to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a).

As two commentators have explained:

> Sometimes administrative law judges assert that they - and not physicians - have the right to make residual functional capacity determinations. In fact, it can reasonably be asserted that the ALJ has the right to determine whether a claimant can engage in sedentary, light, medium, or heavy work. The ALJ should not assume that physicians know the Social Security Administration's definitions of those terms. However, the underlying determination is a medical determination, i.e., that the claimant can lift five, 20, 50, or 100 pounds, and can stand for 30 minutes, two hours, six hours, or eight hours. That determination must be made by a doctor. Once the doctor has determined how long the claimant can sit, stand or walk, and how much weight the claimant can lift and carry, then the ALJ, with the aid of a vocational expert if necessary, can translate that medical determination into a residual functional capacity determination. Of course, in such a situation a residual functional capacity determination is merely a mechanical

> determination, because the regulations clearly and explicitly
> define the various types of work that can be performed by
> claimants, based upon their physical capacities.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, 287-88 (2011) (emphasis added).  The administrative law judge cannot speculate as to a claimant's residual functional capacity, but must have medical evidence, and generally a medical opinion regarding the functional capabilities of the claimant, supporting his determination.  <u>Doak</u>, 790 F.2d at 29 ; <u>see</u> <u>Snyder v. Colvin</u>, 2017 U.S. Dist. LEXIS 41109 (M.D. Pa. March 22, 2017) (Brann, J.) ("I find that substantial evidence does not support the ALJ's ultimate determination.  The ALJ's decision to discredit, at least partially, every opinion of every medical doctor's RFC assessment of Snyder left the ALJ without a single medical opinion to rely upon in reaching a RFC determination. 'Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant.' <u>Maellaro v. Colvin</u>, Civ. No. 3:12-01560, 2014 U.S. Dist. LEXIS 84572, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014)."); <u>Washburn v. Colvin</u>, 2016 U.S. Dist. LEXIS 144453 (M.D. Pa. October 19, 2016) (Conner, J.); <u>Wright v. Colvin</u>, 2016 U.S. Dist. LEXIS 14378, at *45-46 (M.D.Pa. Jan. 14, 2016) (Rambo, J.) ("<u>Chandler</u> stated that an ALJ need not obtain medical opinion evidence and was not bound by any treating source medical opinion.  <u>Id.</u>  However, both these

statements are dicta.  In <u>Chandler</u>, the ALJ had medical opinion evidence and there was no contrary treating source opinion.  <u>Id.</u>  '[D]ictum, unlike holding, does not have strength of a decision 'forged from actual experience by the hammer and anvil of litigation.' . . . the only precedential holding in <u>Chandler</u> is the unremarkable finding that an ALJ may rely on a state agency medical opinion that the claimant is not disabled when there are no medical opinions from treating sources that the claimant is disabled.  <u>See</u> <u>Chandler</u>, 667 F.3d at 361-63. . . . Consequently, with regard to lay reinterpretation of medical evidence, <u>Frankenfield</u>, <u>Doak, Ferguson</u>, <u>Kent</u>, <u>Van Horn</u>, <u>Kelly</u>, <u>Rossi</u>, <u>Fowler</u> and <u>Gober</u> continue to bind district Courts in the Third Circuit."); <u>Maellaro v.</u> Colvin, 2014 U.S. Dist. LEXIS 84572, at *32-34 (M.D. Pa. June 18, 2014) (Mariani, J.) ("The ALJ's decision to reject the opinions of Maellaro's treating physicians created a further issue; the ALJ was forced to reach a residual functional capacity determination without the benefit of any medical opinion.  Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. *See Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity [the claimant] could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."). *See also Arnold v. Colvin*, 3:12-CV-02417,

2014 U.S. Dist. LEXIS 31292, 2014 WL 940205, at *4 (M.D. Pa. Mar. 11, 2014);

*Gormont v. Astrue*, 3:11-CV-02145, 2013 U.S. Dist. LEXIS 31765, 2013 WL

791455, at *7 (M.D. Pa. Mar. 4, 2013); *Troshak v. Astrue*, 4:11-CV-00872, 2012

U.S. Dist. LEXIS 137945, 2012 WL 4472024, at *7 (M.D. Pa. Sept. 26, 2012).

The ALJ's decision to discredit, at least partially, every residual functional

capacity assessment proffered by medical experts left her without a single medical

opinion to rely upon. For example, three physicians opined that Maellaro was

limited in some way in his ability to stand and/or walk: Dr. Dittman opined that

Maellaro could stand/walk for less than one hour, Dr. Singh believed that

Maellaro could stand/walk for fewer than two hours, and Dr. Dawson opined that

Maellaro could not stand or walk for any length of time. Tr. 183, 211, 223. In

rejecting these three opinions, there were no other medical opinions upon which

the ALJ could base her decision that Maellaro essentially had no limitations in his

ability to stand or walk.  Tr. 283. Consequently, the ALJ's decision to reject the

opinions of Drs. Singh and Dawson, and the ALJ's determination of Maellaro's

residual functional capacity, cannot be said to be supported by substantial

evidence."); Gunder v. Astrue, Civil No. 11-300, slip op. at 44-46 (M.D.Pa.

February 15, 2012) (Conaboy, J.) (Doc. 10) ("Any argument from the

Commissioner that his administrative law judges can set the residual function

capacity in the absence of medical opinion or evidence must be rejected in light of

Doak.  Furthermore, any statement in Chandler which conflicts (or arguably

conflicts) with Doak is *dicta* and must be disregarded.  Government of Virgin

Islands v. Mills, 634 F.3d 746, 750 (3d Cir. 2011)(a three member panel of the

Court of Appeals cannot set aside or overrule a precedential opinion of a prior

three member panel). ”); Dutton v. Astrue, Civil No. 10-2594, slip op. at 37-39

(M.D.Pa. January 31, 2012) (Munley, J.) (Doc. 14); Crayton v. Astrue, Civil No.

10-1265, slip op. at 38-39 (M.D.Pa. September 27, 2011) (Caputo, J.) (Doc. 17).

The Court's review of the administrative record reveals that the decision of

the Commissioner is not supported by substantial evidence.  The ALJ gave no

weight to two (2) separate opinions rendered by Plaintiff's treating physician, Dr.

Christian, because "he has not provided any significant treatment for [Plaintiff]'s

back and neck issues."  (Tr. 966).  The ALJ gave limited weight to Dr. Kraynak's

opinion, stating that "[t]he undersigned does not accept the limitations on

standing, walking and sitting as set forth by Dr. Kraynak, in the absence of

supporting medical records or testing. . . His findings on examination are not

quantified or further described in terms of functional limitations in his report and

his statement of [Plaintiff]'s complaints is not indicative of objective findings."

(Tr. 965).  Thus, the ALJ rejected all of the medical opinions regarding Plaintiff's

limitations with sitting, standing, and walking, and instead inserted her lay

reinterpretation of the evidence in arriving at the conclusion that Plaintiff "should

have the option to transfer position from sitting to standing with the maximum of

each interval 30 minutes" when in fact more restrictive limitations were opined by

medical physicians, including Dr. Kraynak and Dr. Christian. (Tr. 945, 965-966).

This Court cannot ascertain from the analysis conducted by the ALJ how

that decision-maker was able to determine a residual functional capacity which

differed from the medical findings and opinions of these physicians regarding

Plaintiff's limitations with sitting, walking, and standing. Furthermore, the very

definition of "light work" found in 20 C.F.R. § 416.967(b) makes it all the more

important that this case be remanded, for this regulation is as follows:

> Light work involves lifting no more than 20 pounds at a time
> with frequent lifting or carrying of objects weighing up to 10
> pounds. Even though the weight lifted may be very little, <u>a job
> is in this category when it requires a good deal of walking or
> standing, or when it involves sitting most of the time with some
> pushing and pulling of arm or leg controls</u>. To be considered
> capable of performing a full or wide range of light work, you
> must have the ability to do substantially all of these activities.
> If someone can do light work, we determine that he or she can
> also do sedentary work, unless there are additional limiting
> factors such as loss of fine dexterity or inability to sit for long
> periods of time.

20 C.F.R. § 416.967(b) (emphasis added). The fact that the ALJ did not give

weight to any opinion involving walking, standing, or sitting, but rather instead reinterpreted the medical evidence in arriving at her RFC determination, goes to support the conclusion that the ALJ's RFC determination is not supported by substantial evidence.  See Snyder, 2017 U.S. Dist. LEXIS 41109 at *13-14 (Brann, J.) ("The ALJ failed to point to any specific medical evidence that would support a contrary opinion on Snyder's standing/walking capabilities, and as a result, it appears that the ALJ was forced to reach a RFC determination without the benefit of any medical opinion.  Accordingly, the ALJ's conclusion is not supported by substantial evidence.").  Therefore, pursuant to 42 U.S.C. § 405(g), remand is warranted, and this Court declines to address Plaintiff's remaining allegations of error, as remand may produce a different result on this claim, making discussion of them moot.  Burns v. Colvin, 156 F. Supp. 3d 579, 598 (M.D. Pa. Jan. 13, 2016); see LaSalle v. Comm'r of Soc. Sec., Civ. No. 10-2011 U.S. Dist. LEXIS 40545, 1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## **CONCLUSION**

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision

of the Commissioner will be vacated, and the matter will be remanded to the Commissioner of the Social Security Administration.

A separate Order will be issued.

**Date**: August 18, 2017

/s/ **William J. Nealon**
**United States District Judge**